Good morning, Your Honors. This is Christopher Dellert representing Plaintiff Appellant Linda Tanielu. I would like to reserve whatever time I have left at the end for rebuttal. All right, counsel, please be reminded that the time shown on the clock is your total time remaining. Yes, ma'am. All right, so an issue in this case is whether the administrative law judge's findings were based on the correct legal standards and were supported by substantial evidence in the record. We assert that this is not the case. Here, the administrative law judge cited medical findings in finding that Ms. Tanielu's back impairment was not as limiting as she had alleged. Now, the regulations, social security rulings, and case law all reject this type of analysis since pain is an idiosyncratic response to an impairment. Once she had proven that she had an impairment that could cause some degree of the symptoms she was alleging, the administrative law judge was required to consider other factors that stood out in the regulations and the social security rulings. The only factor that the administrative law judge might be said to have considered was that surgery had not been recommended based on the benign nature of the MRI findings. Now, back surgery is recommended primarily when it can relieve pressure on nerves causing ridiculous symptoms. It's not helpful in relieving back pain as Ms. Tanielu is experiencing here. Further, the benign finding that the orthopedist was referring to was the lack of nerve impingement, which might have been responsive to further surgery. And while this source did not recommend surgery, he did recommend epidural steroid injections as well as gabapentin and neurontin. This court has found that such injections are not necessarily conservative treatment. Thus, there would not be substantial evidence that Ms. Tanielu's back impairment was not as severe as she was alleging. Similarly, when discussing her shoulder pain, he referred solely to the objective findings, the x-rays. X-rays are no good at evaluating muscle or ligament injuries, which is why she was pressing to have that imaging done and why she might have been seen to be verbally aggressive at that time. She was trying to search for a cause for her pain. Yes, ma'am. Could you specifically pinpoint which findings of the ALJ that you are asserting are not supported by substantial evidence? There I was talking about his evaluation of her symptom complaints, about the limiting nature of her back injury, how it impaired her ability to sustain activity that would be consistent with the opinion of Nurse Young, who said that she was limited to sedentary work and would not likely be able to work competitively in the next six months at the time that he completed his assessment. So, you are challenging specifically the discounting of the claimant's testimony and the discounting of the opinion from Nurse Young? Yes, ma'am. In particular, the administrative law judge did not even address Nurse Young's opinion that competitive employment had been ruled out for at least the next six months. That was never addressed. It was a probative piece of evidence and he needed to either adopt it or explain why he was not doing so when he was giving significant weight to that opinion. Well, I thought that the ALJ did give Nurse Young's opinion weight. Yes, on, let's see, it did give significant weight to the opinion, but he did not address that limitation to no competitive employment for six months. But the ALJ's finding of light work was consistent with the opinion of Dr. Kim, wasn't it? Well, it was sedentary, but yes, but Nurse Kim was one of the treating sources. Right, but Nurse Kim, is her status equal to that of Dr. Kim as a treating source? As an other source, no, it's not typically considered, but the regulations as they existed at that time did set forth that in certain circumstances, a other source may have more familiarity with the individual's condition and therefore would be entitled to more information. So, in response to Judge Rawlinson's question, your principal problem is the way that the Young evidence was treated? That's one of the arguments that we made, yes. Okay, is there anybody else that you think was not a medical source that was not sufficiently credited? As far as the medical evidence came, our arguments focused primarily on the psychiatric symptoms, and their limiting effects on her ability to sustain. But which doctors didn't the ALJ pay sufficient attention to? In the, as far as physical? Any, I'm just asking, I'm just trying to figure out what, I just want to pinpoint your argument, who did the ALJ not give sufficient attention to? Well, at that stage, we did not argue as far as the physical impairments, we just felt that her subjective allegations gave rise to greater limitation than was accommodated. Nurse Young is the only one who addressed the ability to sustain that employment. So, does your case rise or fall on how we evaluate the ALJ's treatment of Young? That is, that is one of the issues that would have to be re-evaluated on remand, which is what we've been asking for, yes. That's why you've got a little bit of time. I'm really trying to figure out whether you've got any other argument. I keep asking, is there anybody else here that the ALJ dismissed and shouldn't have dismissed out of hand? The, the two examining physicians, Zolnikov and Riddell, who both examined plaintiff on, or Ms. Teniello on two occasions. Now, neither one of them is a physician, they're both PhDs. Correct. And the only other medical source opinion related to the mental impairments was from the examining source that the ALJ sent Ms. Teniello to after the hearing, who essentially relied on the same kind of findings and information to come to a different conclusion. So, when you weigh the four opinions that were very consistent with each other versus the one opinion that was an outlier, and that, that opinion didn't address the relative areas of functioning related to our ability to sustain employment. The two, the first two examining opinion or examining sources warranted greater weight than did Dr. Villette, who evaluated her in 2017. You guys all just reserve the remainder of my time. Thank you. All right. Thank you, counsel. We'll hear from the government. Good afternoon. And may it please the court. My name is Christopher Brackett. I'm here on behalf of the Commissioner of Social Security. And I ask that the court affirm the district court judgment and uphold the ALJ's decision. Now, first, I want to get to something that opposing counsel said toward the end of his argument regarding the, the psychologist's opinion. We have Zolnikov and Rodel on one side and Villette on the other. Now, these are all examining psychologists who reviewed, conducted evaluations, took mental status examinations of a claimant. But it was, opposing counsel characterized Dr. Villette as the outlier, but Dr. Villette didn't just have the same evidence that those two other psychologists had. He actually also conducted psychological testing in the form of IQ and memory testing, in which he found mild memory limitations and not average, but just below average intelligence or cognitive functioning. And generally these were consistent with mild findings and fully support his opinion that the claimant was limited to simple repetitive tasks, that she had mild limitations as far as social interaction and that her impairments caused no other limitations. Okay. Counsel, I, I, I'm looking at the ALJ's opinion. I've got a number of different pages here. It's page 10 of the ALJ's opinion. It's page 36 in the ER, and that's the paragraph that deals with Zolnikov, Rodel, Eisenhower and Colby, which are the four psychologists whose opinions apparently were all consistent. The ALJ says there is objective evidence that claimant has a mental health condition and some resulting limitation, but claims that these evaluations were largely based on self-reported symptoms and complaints. My review of Zolnikov and Rodel in particular suggests that they did do some testing with respect to the claimant here, and it wasn't entirely self-reported symptoms and complaints. I was also a little puzzled by the ALJ's conclusion that the four of them had been, had been completing check the box forms. Now I've, I've seen a lot of social security cases and I sometimes see cases where counsel has provided a form to a, to a medical provider and it's not a very useful form. These were state forms. These were either state or federal forms that they were being asked to fill out and they were very careful in marking the boxes. The difference between Zolnikov, Rodel and Vallette is that Zolnikov and Rodel chose a couple of boxes as marked and Vallette chose, chose moderate. Well, that seems like, that seems like going to a professor and saying, how come you gave me a B plus instead of an A minus? I mean, those are minor changes and I'm not sure I understand the ALJ's reasoning here. Well, your honor, I would, I would agree that this, this reason that they're based, that is solely a check box form. I don't think that provides a lot of insight into what gives one opinion greater weight than the other. And I would concede that just if that were the only reason that wouldn't be sufficient. The ALJ looked to a number of factors and gave several reasons. The strongest, I think, are the consistency of these opinions with the treatment record and with the findings that, for example, the consistent, inconsistency, pardon me, inconsistency of Zolnikov and Rodel's opinions with the treating record and with Vallette's. Let me go back to the, let me go back to the B plus, A minus problem. You know, for many of those Zolnikov and Rodel did check that these were moderate restrictions, perfectly consistent with Vallette, but you have just a couple of categories where they were discerning to say, well, not everything is moderate or mild. There are some things here that are marked. It does seem to be discerning. They saw her on more than one time. I think Vallette only saw her once. Um, and it, it appears to me that Zolnikov and Rodel did a lot more than just rely on her own complaints. But I've just, I'm, I'm really, I'm really puzzled as to why the ALJ chooses between one over the other on things that are fairly minor, fairly minor differences. And, and when, especially when you have four psychologists who have reviewed her and come to the, to similar conclusions and one who sees her once and comes to a slightly different conclusion and all of a sudden everybody else gets tossed out. Well, if I can start at the, at the end and then come back to the, uh, A plus B minus or A minus B plus issue, uh, the, the, the four psychologists, only two of those examined her for the other two were, uh, were reviewing her. And I would also point out that not, not raised in this case, there's two, uh, state agency psychologists from the, uh, DDS that the ALJ relied upon. Doctors Robinson and Brown, who also reviewed the evidence and came up with different conclusions than what the Eisenhower and Colby came up with. Now, when it comes to the, the marked moderate limitations, uh, Dr. Valette only found moderate limitations when it came to performing complex tasks. And the ALJ's RFC rules out complex tasks. He, he specifically limits her to simple repetitive tasks. Yeah, a point where, uh, Dr. Valette found, I think it's no or mild limitation in those areas. He also found no more than mild limitations in social functioning. Dr. Valette did. But then the, the one critical thing is the, uh, Dr. Valette also goes on to say, when asked, do the, do the claimant's impairments cause any other limitations? And here's a, here's a blank space for you to write out what those are. He checked the box and said, no, she didn't. They didn't cause any other limitations. Now, when it comes to doctors, uh, Riddell and Zolnikov, they described limitations like she couldn't complete a normal work day or work week without psychological, uh, interruptions from psychological symptoms. That's inconsistent with Dr. Riddell, Dr. Valette's conclusion that she had no other limitations. Moreover, Dr. Valette's, uh, when he completed that form, it was with the instruction that he was to consider her ability to complete, um, to work eight hours a day, five days a month schedule. So his, his boxes, the boxes he checked were naturally within that framework of working full time. And ultimately what it comes down to, I think the strongest point for, for the, uh, for upholding the ALJ's findings in this regard is, is the consistency or inconsistency with the claimant's very conservative and minor treatment record when it comes to her mental health functioning. She was having counseling with a therapist. Uh, I think at one point it was saying that it was twice a month. Um, and she also had her, she was representing to this therapist. She, she even told Dr. Valette. And I think at one point, Dr. Riddell, that, uh, her symptoms were well controlled with medication. Now there was, there was some variance in her functioning, but the ALJ noted that, I hope, I think the ALJ noted it, uh, that it was, uh, in response to situational stress, stressors, such as, uh, she was undergoing a divorce that sounded like it was a pretty bad divorce. Her ex-husband had custody of the child. These are the type of things that are bound to, to, uh, exacerbate symptoms in a, in a person who's completely functional, let alone, uh, someone who has the limitations that the ALJ found. Now, when it comes down to the consistency, this is a valid factor for the ALJ to consider when evaluating opinions. This is spelled out in the regulations that consistency and objective support are two, two, uh, factors that the ALJ must consider. And really what it comes down to, we're, we're talking about findings of fact. These are conclusions that the ALJ reached when he read through the record, uh, when he considered the testimony and the opinion evidence. And when those findings of fact are supported by substantial evidence, this court must affirm. And the, the substantial evidence standard is highly deferential. The Supreme Court just, uh, just less than two years ago, reiterated this in the context of social security cases, that it is just such, such evidence as a reasonable mind might find capable of supporting a conclusion. It doesn't mean that the, the reasonable mind must find, or that it's even a more likely conclusion. It's just such evidence that's adequate to support the ALJ's finding. And that's what we have here that, you know, uh, a person might look at the evidence and say, I would have concluded differently than what the ALJ did, but ultimately that that's not the, the holding that is compelled. That's not the conclusion that must be found. Uh, the ALJ's findings are, represent a reasonable interpretation of the record. And when the, when there's complete competing reasonable interpretations, this court should defer to the ALJ's findings of fact. And finally, I just have a minute left. I just want to mention, I think that, uh, Appellant's counsel and I are in agreement that, uh, if this court finds harmful error, the appropriate remedy would be revamped, not, not a payment of benefits. But, uh, the commissioner stands by the, his position that this decision is supported by substantial evidence and that the, uh, the ALJ's conclusion that the claimant is not disabled should be upheld by this court and the district court judgment affirmed. Thank you, counsel. Thank you. Rebuttal. Yes, ma'am. The, I guess real quick is about regarding the treatment notes that, uh, the ALJ relied on. Those treatment notes largely boil a 60 minute session down to one or two sentences that describe the current, um, stressors. It doesn't talk about what her baseline function is. Um, it doesn't address the kinds of issues that were raised in the psychological evaluations. Therefore, they're not as a good indicator of whether or not there was consistency between the treatment notes and the opinions. But counsel, the ALJ is entitled to rely on those, correct? Yes, to consider the record as a whole. You can't just pluck like these sentences, isolated sentences out. And it's questionable as to whether or not those are even, you know, they're generally boilerplate findings. It did not change from session to session. So how much of a reliance are there when they're only discussing the specific, um, stressor of the day? Like she's like, okay, today she's looking for housing. Right. Counsel, but if we, if we toss all of that out, we'll toss everybody out. We'll toss out all the medical evidence, including, including your medical evidence. What, what, what else is the ALJ supposed to decide this on? Well, there, the medical records that, um, do demonstrate that, um, her condition, you know, even when it improved with medication, it never really improved beyond her baseline. There were times when it dipped below that and medication brought it back up, but then she would not have the same response and they'd have to keep changing it. So, uh, the primary thing was just to keep her at a baseline level of functioning. And she hasn't been able to work since 2013. Um, and that hasn't changed, uh, despite the medication. Use of medication. So no other questions that I rest my case. Thank you. It appears not. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Rawlinson, Bybee, Moskowitz